## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2016-KA-00347-COA

**RANZINO AHMAD HARRIS A/K/A RANZINO HARRIS A/K/A RANZINO A. HARRIS**                                        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                        **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/06/2013 |
| TRIAL JUDGE: | HON. LEE SORRELS COLEMAN |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | RICHARD SHANE MCLAUGHLIN |
| | NICOLE H. MCLAUGHLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/26/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GREENLEE, J., FOR THE COURT:**

¶1. Ranzino Ahmad Harris appeals his conviction in Lowndes County Circuit Court of murder asserting (1) the trial court erred when it admitted an unavailable witness's preliminary-hearing testimony because it violated his Sixth Amendment right of confrontation; (2) the trial court erred when it admitted a witness's hearsay statement as an excited utterance; (3) the evidence was insufficient; and (4) the verdict was against the overwhelming weight of the evidence. Finding no error, we affirm.

**BACKGROUND**

¶2. On the morning of May 17, 2010, Harris attempted to contact his ex-girlfriend, Ashley Lee, to no avail. In further efforts to make contact, he went to her house, where he discovered Ashley and her sister, Tericia Lee, each with their own overnight guest, Justin Murray (Ashley's) and Michael Brewer (Tericia's). Harris confronted Ashley, cornered her in her bathroom, and began choking her. Murray and Brewer came to Ashley's aid, pinning Harris on a bed, where the two assaulted Harris, punching him repeatedly. Ashley and Tericia implored the two to stop, and they subsequently unpinned Harris. After he was unpinned, Harris left. Then, moments later, he returned with his pistol drawn and, as the outside kitchen door opened, fired two shots. Both shots struck Murray, who died shortly thereafter from his wounds. At trial, Harris testified he returned to Ashley's home to retrieve his cellular phone, which he purportedly left in the house. Both Tericia and Brewer testified that Harris forced the door open. Brewer also testified he and Murray were both standing and not moving toward the door or Harris.

¶3. Detective George Harris[1] of the Columbus Police Department was one of two officers who responded to a 911 call reporting a possible homicide at Ashley's home. Among his discoveries upon arriving at the scene, Detective Harris found Brewer "walking around," repeatedly stating, "he didn't have to do this, he didn't have to do this." Harris later surrendered at the Columbus Police Department.

¶4. Harris was indicted on October 27, 2010, for one count of murder in violation of Mississippi Code Annotated section 97-3-19 (Rev. 2006) and one count of aggravated assault

---

[1] On the day of the incident, Detective Harris was ranked a patrolman.

in violation of Mississippi Code Annotated section 97-3-7 (Rev. 2006). A four-day jury trial was conducted during September 3-6, 2013. Testimony was heard from Detective Harris and Ashley, among others.

¶5.    Detective Harris testified, "When we walked up on the porch, I noticed a young man, I know him as Mike, we call him Little Mike, he was walking around in the living room and by the doorway area. Kept stating, 'He didn't have to do this, he didn't have to do this.'" Harris did not object, and Detective Harris continued his testimony, describing a diagram of the scene. Later, the State asked, "How would you describe [Brewer's] demeanor and his emotional state at that point, sir?" Detective Harris responded, "He was, like, walking in circles, kept repeating, 'He didn't have to do this. That wasn't called for.'" Harris (the defendant) contemporaneously objected to that answer as hearsay. In response, the State argued, "at that point it would have been an excited utterance, because he had just been shot and saw his friend killed." The trial court overruled the objection. The State continued, "Okay. Yes, sir?" Detective Harris resumed, "He was—this—'He didn't have to do that. This is my boy, he didn't have to do my boy like that.'" To which the State asked, "Okay. And was he visibly upset? Could you tell that, sir?" "Yes, he was," Detective Harris replied.

¶6.    Ashley was deemed unavailable to testify at trial. However, she had formerly testified during a probable-cause hearing in which she appeared as a witness for Harris. Prior to trial, the State filed a motion to use Ashley's prior testimony. The trial court heard arguments on this motion on two separate occasions, both of which occurred during trial, but outside the jury's presence. During these arguments, Harris did not contest Ashley's unavailability—only

3

that he was limited in material and scope during the development of her testimony, stating, "it's a confrontation clause issue." Harris further claimed: "[T]hroughout the entire transcript, as I tried to develop the testimony more with each witness, [the State] would object and say, this is for discovery, Your Honor, we're not here to have the trial on the whole case. So I was limited on every witness in my ability to develop the cross-examination." The transcript of Ashley's prior testimony (approximately four pages in length) contained one objection to a question Harris asked: "And you had sex with [Murray], had you not?" Ashley did not respond. That question and objection colloquy was redacted for trial. Later, Harris maintained the redacted question was "the most important question with regard to heat of passion," stating he "wasn't able to develop the testimony as [he] saw fit." However, the question and answer immediately preceding the redacted portion of Ashley's testimony was included. There, Harris asked, "Well, Justin Murry [sic] was in your bed at the time, wasn't he?" Ashley responded, "Yes."

¶7.    Harris was found guilty of murder.[2] On the same day, he was sentenced to a term of life imprisonment in the custody of the Mississippi Department of Corrections. On the tenth day following the verdict and sentence, Harris moved for a judgment notwithstanding the verdict or, in the alternative, a new trial. Approximately three years later, the trial court denied Harris's motion.[3] Harris timely appealed to this Court.

_____

[2] Harris was also charged with aggravated assault, but was found not guilty.

[3] We note that under the newly created Mississippi Rules of Criminal Procedure, effective July 1, 2017, Harris's motion for a JNOV or, in the alternative, a new trial would have been "deemed denied as of the thirtieth day" of pendency. MRCrP 25.3.

4

## I.      Confrontation Clause

¶8.      Harris asserts the trial court erred in admitting Ashley's prior testimony because it violated his Sixth Amendment right of confrontation, and that he was not afforded a "full cross-examination." We review a trial court's ruling on the admissibility of evidence for abuse of discretion. *Barron v. State*, 130 So. 3d 531, 538 (¶23) (Miss. Ct. App. 2013). Constitutional issues are reviewed de novo. *Jenkins v. State*, 102 So. 3d 1063, 1065 (¶7) (Miss. 2012).

¶9.      The United States Supreme Court has held that the Sixth Amendment Confrontation Clause bars the admission of "testimonial statements" made by a witness who does not appear at trial, unless the witness is unavailable *and* the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S 36, 53-54, 59 (2004). Although the Court in *Crawford* declined to define "testimonial" statements, it noted the term, at a minimum, includes "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." *Id.* at 68. Accordingly, Ashley's preliminary-hearing testimony is testimonial, and because she was unavailable, our inquiry turns to whether Harris had a prior opportunity to "cross-examine" or, as here, to examine, because Harris called Ashley as his witness.

¶10.    A defendant's right to cross-examination is not unlimited, and "[t]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might

5

wish.'" *Goforth v. State*, 70 So. 3d 174, 184 (¶46) (Miss. 2011) (emphasis added) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987)). Further, no Confrontation Clause violation will be found where defense counsel was not "significantly limited in any way in the scope or nature of his cross-examination of the witness . . . at the preliminary hearing." *California v. Green*, 399 U.S. 149, 166 (1970).

¶11.    Here, Ashley was Harris's witness at the earlier probable-cause hearing and was thus subject to his direct and redirect examination. Therefore the only pertinent question is whether Harris was "significantly limited in any way in the scope or nature of his cross-examination" or, as here, "examination" of Ashley.

¶12.    Harris's premier argument is that he was unable to fully develop Ashley's cross-examination. In support, Harris states (1) discovery is necessary to support a meaningful cross-examination; (2) his questioning of Ashley was limited to the issue of probable cause; and (3) the nature of a preliminary hearing inherently changes cross-examination strategy. However, Harris fails to specifically address how these issues limited Ashley's testimony in nature and scope: he does not show how his examination of Ashley would be any different at the preliminary hearing given the benefit of discovery, and fails to demonstrate how limitation to the issue of probable cause changed his course of questioning with respect to Ashley. Harris nevertheless had the opportunity to examine Ashley during the preliminary hearing, despite any perceived change in strategy.

¶13.    Further, we are unpersuaded by Harris's argument that Ashley's prior testimony did not make clear enough that Ashley and Murray were in bed together, as overnight lovers,

when Ashley's ex-boyfriend arrived for an unexpected visit. The question before the redacted portion of Ashley's testimony asked whether Murray and Ashley were in bed together that morning. Ashley answered in the affirmative. The trial court found the jury could "reasonably conclude" any romantic involvement between Ashley and Murray that morning. We agree. In sum, we find Harris's examination of Ashley was not significantly limited in scope or nature, as there was no showing of such limitation within either the record of the case or the testimony itself. In result, admission of Ashley's prior testimony did not violate the Confrontation Clause.

¶14. But, even if admission of Ashley's prior testimony was an abuse of discretion, the error was harmless. Ashley's prior testimony mentioned Harris tried to choke her and that Harris fought with Murray and Brewer. But it did not mention anything after Harris was pinned down by Murray and Brewer—not even the shooting. Nor did it include that Harris left, or that he came back. Further, the substance of Ashley's testimony was thoroughly covered by Tericia's and Brewer's testimony. In result, we find this issue is without merit.

## II. Excited Utterance

¶15. Harris asserts the trial court erred when it found Brewer's statements made in front of Officer Harris were excited utterances under Mississippi Rule of Evidence 803(2). Again, we review a trial court's ruling on the admissibility of evidence for abuse of discretion. *Barron*, 130 So. 3d at 538 (¶23).

¶16. Rule 803(2) allows for a hearsay exception for an excited utterance, which is "[a] statement relating to a startling event or condition, made while the declarant was under the

7

stress of excitement that it caused." The advisory-committee notes shed further light on admitting an excited utterance:

> The underlying theory of the excited utterance exception is that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication. . . . [T]he essential ingredient here is spontaneity. With respect to the time element, the issue is the duration of the excited state. This, depending on the exact circumstances of a case, can vary greatly. . . . An excited utterance need only "relate" to the startling event, and, therefore, the scope of the subject matter of the statement may be fairly broad.

M.R.E. 803 advisory committee's note.

¶17. Brewer was standing right next to Murray when he was shot twice, and Brewer's statement was made within approximately ten minutes of the shooting. The statement was unsolicited, and when Detective Harris was asked if he could tell whether Brewer was "visibly upset," he testified, "Yes, he was." In *Barron*, we found no abuse of discretion in admitting similar comments made ten to twenty minutes after the shooting in response to questions from bystanders, and where there was testimony that the declarant was "visibly shaken up." *Barron*, 130 So. 3d at (¶21). Here, we find no abuse of the trial court's discretion in admitting Brewer's statements as excited utterances. Thus, we find this issue is without merit.

### III.    Sufficiency of the Evidence

¶18. Harris asserts the evidence was insufficient to convict him of murder. The critical inquiry in addressing a challenge to the sufficiency of evidence is "whether the evidence shows beyond a reasonable doubt that the accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the

8

evidence fails to meet this test it is insufficient to support a conviction." *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005) (quoting *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968)). "The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (citing *Jackson v. Virginia*, 443 U.S. 307, 315 (1979)).

¶19. Harris was convicted of deliberate-design murder, which has three requirements: the defendant must have (1) killed the victim, (2) without authority of law, and (3) with deliberate design to effect death. Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). "[D]eliberate design connotes an intent to kill." *Wilson v. State*, 936 So. 2d 357, 364 (¶17) (Miss. 2006). "[D]eliberate indicates a full awareness of what one is doing and generally implies careful and unhurried consideration of the consequences." *Id*. "However, deliberate design to kill a person may be formed quickly and perhaps only moments before the act." *Id*. "Deliberate design, as a matter of law, may be inferred through the intentional use of any instrument which, based on its manner of use, is calculated to produce death or serious bodily injury." *Id*.

¶20. In addition to arguing self-defense, Harris asserts he killed Murray in the heat of passion upon discovering his ex-girlfriend with an apparent overnight lover. Harris claims this offense, at most, warrants a conviction of heat-of-passion manslaughter. For heat-of-passion manslaughter to be implicated, there must be a provocation that is immediate and reasonable enough. *Parker v. State*, 119 So. 3d 987, 994 (¶16) (Miss. 2013). With regard to

9

immediacy, the pertinent question is whether there was a sufficient cooling-off period between the provocation and the killing, which negates a claim the killing occurred in the heat of passion. *Id*. Heat of passion and immediacy, in particular, are questions of fact to be resolved by the jury on a case-by-case basis. *Id*.

¶21. Here, Harris admitted he killed Murray and that he left the house and came back before he shot Murray. Although Harris testified Murray and Brewer were coming toward him at the time he shot Murray, testimony to the contrary was submitted. That testimony claimed Harris left the house and returned "moments" later to forcefully enter the house with a pistol drawn, twice firing it and killing Murray. Given that evidence, "any rational trier of fact could have found all the essential elements" of deliberate-design murder without authority of law and "beyond a reasonable doubt." Thus, we find no merit in this issue.

### IV. Weight of the Evidence

¶22. Lastly, Harris asserts his murder conviction is against the weight of the evidence. When reviewing a claim that a conviction is against the weight of the evidence, this Court will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Bush*, 895 So. 2d at 844 (¶18) (citing *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997)). The verdict here was not against the overwhelming weight of the evidence.

¶23. Harris admitted to killing Murray and claimed it was in self-defense. He admitted he reapproached the house with his gun drawn, and claimed he returned to the house to retrieve his cell phone. Harris also claimed that as the door opened, Murray and Brewer were

10

charging at him. The State offered evidence that Harris forced the door open, and that neither Murray nor Brewer was moving toward Harris as the door opened. We agree with the jury's resolution of the conflicting testimony. Thus, we find this issue is without merit.

## CONCLUSION

¶24. We affirm the judgment of the circuit court for Harris's conviction of murder and sentence of life imprisonment.

¶25. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, CARLTON, FAIR, WILSON AND WESTBROOKS, JJ., CONCUR**.